1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALEX G., a minor, by and
through DR. STEVEN G., his
Guardian Ad Litem; DR. STEPHEN
G.; and HELEN G.,

       Plaintiffs,

    v.

BOARD OF TRUSTEES OF DAVIS
JOINT UNIFIED SCHOOL DISTRICT
et al.,

       Defendants.

CIV-S-03-2258 DFL CMK

MEMORANDUM OF OPINION
AND ORDER

18

19

20

21

22

23

24

25

26

    Plaintiff Alex G. ("Alex") is an elementary school student who is eligible for special education services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.  He and his parents, Dr. Stephen G. and Helen G., assert several claims against the Davis Joint Unified School District (the "District"), the District's board of trustees (the "Board"), and a number of its administrators and educators. Defendants move for summary judgment on plaintiffs' discrimination and retaliation claims under § 504 of the

1

Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 793.  The
motion is GRANTED.

I.

Alex is a third-grader with autism.  (Defs.' SUF ¶ 6.)  In
August 2001, Alex's family moved to Davis and enrolled Alex in
the first grade in the District for the 2001-02 school year.
(Id.; Wedner Decl. Ex. A at 4.)  In accordance with Alex's
individualized education plan ("IEP") from the transferring
school district, the District placed Alex in a regular education
classroom at Valley Oak Elementary School ("Valley Oak") with
support services.  (Mot. at 2.)  In addition, the District
developed a behavior intervention plan ("BIP") to address Alex's
history of aggressive outbursts and violent tendencies.  (Defs.'
SUF ¶ 9.)

As part of Alex's BIP, the District established an
emergency plan that allowed the use of physical restraints when
necessary to protect other students or staff from physical harm.
(Id.)  Alex's parents initially consented to implementation of
the BIP and the use of physical restraints.  (Id. ¶ 8.)  However,
in June 2002, just prior to Alex starting the second grade,
Alex's parents withdrew their consent.  (Id.)

Alex's behavior problems continued in the second grade.  On
the first day of school, Alex had a serious behavior incident
that resulted in a three-day suspension.[1]  (Id. ¶ 29.)  Alex had

---

[1]  During this "serious behavior incident," Alex assaulted
and injured four staff members.  (Wedner Decl. Ex. A at 4 n.3.)

2

two more serious behavior incidents in October 2002, during the
first week he returned to school.[2]  (Id. ¶ 12.)  During these
incidents, two of Alex's special education assistants --
defendant paraeducator Robert Arosteguy ("Arosteguy") and
defendant special education teacher Michael Inchausti
("Inchausti") -- used emergency physical restraints to bring Alex
under control.[3]  (Id.)  Inchausti and Arosteguy used the physical
restraints in accordance with the District's plan for emergency
interventions.  (Id. ¶ 14.)

On December 4, 2002, Alex's parents requested a due process
hearing to resolve their continuing dispute with the District
over Alex's special education services and his placement for the
2001-02 and 2002-03 school years.  (Id. ¶ 32.)  While this
dispute was ongoing, Alex had another serious behavior incident
involving his teacher, defendant Penelope Dwyer ("Dwyer"), and
another student, resulting in another three-day suspension.[4]

---

Alex was taken to a resource room, where the staff put themselves
in the four corners of the room.  (Id.)  All furniture was slowly
removed so Alex could not throw or destroy the furniture.  (Id.)
Eventually, Alex wore himself out.  (Id.)

[2]  Because of continuing disagreements between the District
and Alex's parents, Alex did not return to school until October.
(Mot. at 3.)  During these incidents in early October, Alex was
jumping across wet tabletops.  Defendants restrained him, they
contend, because they believed his actions posed a serious danger
to his own safety.  (Wedner Decl. Ex. X at 12.)

[3]  Arosteguy and Inchausti used "wall restraints" on these
occasions.  (Wedner Decl. Ex. X at 13.)  Based upon a description
provided at the hearing on this matter, wall restraints involve
pinning the child up against a wall until he calmed down.

[4]  During this incident, Alex punched his teacher in the
stomach twice and kicked another student in the head.  (Id.)

1   (Wedner Decl. Ex. A.)  Alex's parents decided to keep Alex out of
2   school until they resolved their disputes with the District.
3   (Id.)

4        The District and Alex's parents entered into a settlement
5   agreement on January 31, 2003.  (Defs.' SUF ¶ 33.)  The
6   settlement agreement covered the provision of special education
7   services for the 2001-02 and 2002-03 school years.  (Wedner Decl.
8   Ex. H.)  As part of the agreement, the District agreed to: (1)
9   contract with an outside organization, Bridges, to conduct a
10  functional analysis assessment and develop a behavior
11  intervention plan for Alex within the school setting;  and (2)
12  conduct a comprehensive academic assessment of Alex.  (Id.)  In
13  return, Alex's parents released all claims under the IDEA up to
14  the date of the settlement agreement.  (Id.)

15       When Alex returned to school on February 19, 2003, his
16  disruptive behavior continued to escalate.  He was unable to
17  remain in the classroom for more than ten minutes at a time and
18  spent the majority of his day outside with one or two of his
19  aides.  (Id. Ex. A at 5.)  His behavior included kicking,
20  screaming, yelling, spitting, biting, and throwing objects.
21  (Id.)  Additionally, Alex pulled the school's fire alarms on five
22  separate occasions during the early weeks of March.  (Id.)  The
23  Bridges staff advised the District that the best way to handle
24  Alex's maladaptive behavior, including the pulling of the fire
25  alarms, was to ignore it and deny him the reaction he was
26  seeking.  (Id.)  The District made efforts to implement this

                                4

1  strategy, but at least some teachers continued to reprimand Alex
2  for pulling fire alarms.  (Pls.' SUF ¶ 78.)

3       Alex's disruptive tendencies put a strain on Dwyer, who his
4  regular classroom teacher.  (Id. ¶ 80.)  She started receiving
5  counseling for anxiety and began keeping a log of daily events
6  regarding Alex after his return to school in February 2003.  (Id.
7  ¶ 85.)  At some point during February or March, Dwyer informed
8  the District's special education coordinator, defendant Laurel
9  Clumpner ("Clumpner"), of her issues with Alex and her concerns
10 about her and other students' safety.  (Id. ¶ 79.)  She also
11 sought the assistance of her teacher's union.  (Id. ¶ 86.)  The
12 District did not inform Alex's parents of Dwyer's anxiety.
13 (Opp'n at 4-5.)

14      On March 19, 2003, an IEP meeting was held to discuss the
15 functional analysis assessment, the proposed behavior
16 intervention plan from Bridges, and the District's academic
17 assessments of Alex.  (Id.)  During the IEP meeting, the Bridges
18 staff discussed the idea of implementing a "whole class
19 reinforcement" system in Dwyer's classroom.  (Id.)  The proposed
20 "whole class reinforcement" system involved giving the class some
21 sort of tangible reward, such as putting a marble in a jar, when
22 the majority of the class performed a task well.  (Varma Decl.
23 Ex. 3 at 25.)  However, Bridges had not yet completed the
24 functional analysis assessment and the parties could not agree on
25 Alex's IEP, so they scheduled another meeting for a week later.
26 (Id.)

During the week between the March 19th and March 26th IEP meetings, Dwyer developed her own classroom program, called "Penny's Proud" and "Grant thinks I'm great." (Defs.' SUF ¶ 38.) Her program involved giving students a small piece of paper with a happy graphic on it when they exhibited positive behavior choices. (Wedner Decl. Ex. Z at 278-79.) During the March 26th IEP meeting, Bridges told the IEP team that Dwyer's program was insufficient to meet Alex's needs and made some alternative suggestions. (Id. Ex. A. at 6.) The IEP meeting concluded without the parties reaching an agreement on this issue or on Alex's goals and objectives for his IEP plan. (Id.) However, the District did agree to have its staff undergo further training in Bridges' behavior modification methodologies. (SUF ¶ 40.) That training was held on April 4, 2003. (Id.)

In late March 2003, the principal of Valley Oak, defendant Consuelo Coughran ("Coughran"), contacted the District's superintendent, defendant David Murphy ("Murphy"), about Alex's escalating behavior and the five fire alarm incidents. (Id. ¶ 22.) Murphy directed his staff to investigate the District's legal options. (Mot. at 4.) While the District was considering its options, Alex's parents wrote a letter to Murphy and the Board in which they complained that the District had not complied with the settlement agreement. (Defs.' SUF ¶ 28.) Alex's parents received no response from the District. (Opp'n at 4.)

On April 18, 2003, following several conversations with its legal counsel, the District filed a request for a temporary

restraining order ("TRO") against Alex in the Yolo County
Superior Court.  (Wedner Decl. Ex. H.)  The District sought to
have Alex transferred to Patwin Behavior Learning Center
("Patwin"), a public school within the District for children with
behavior difficulties.  (Id.)  The court granted the TRO that
day, ordering Alex to attend Patwin.  (Id.)  However, two months
later, following a preliminary injunction hearing, the court
modified its ruling.  (Varma Decl. Ex. 8.)   While the court
prohibited Alex from returning to Valley Oak prior to August 31,
2003, it refused to issue any orders regarding Alex's educational
placement and vacated the portion of the TRO ordering Alex to
attend Patwin.  (Id.)  Instead, the court directed the District's
special hearing office to exercise its discretion under
applicable authority to address Alex's placement.  (Id.)

On April 21, 2003, Alex's parents requested another
administrative due process hearing before a hearing officer,
challenging, among other things, the District's implementation of
the settlement agreement.  (Defs.' SUF ¶ 43.)   The hearing took
place on July 31, 2003.  (Id. ¶ 45.)  The hearing officer issued
a written decision shortly thereafter, finding in favor of the
District on some issues and in favor of Alex on other issues.
(Id.)

Plaintiffs filed this first amended complaint on December
24, 2003, bringing claims under the IDEA, § 504, 42 U.S.C. §
1983, and state law against the District, the Board, and numerous
administrators and educators in the District (the "individual

1  defendants"). Following the court's July 30, 2004 order, the

2  only remaining claims are: (1) under the IDEA, a challenge to

3  certain portions of the Hearing Office's decision; (2) a

4  discrimination claim under § 504 against the District, the Board,

5  and the individual defendants; and (3) a retaliation claim under

6  § 504, also brought against the District, the Board, and the

7  individual defendants. Defendants move for summary judgment on

8  the discrimination and retaliation claims only.

9                                    II.

10 A.   § 504 Discrimination Claim

11      To establish a prima facie case of discrimination under §

12 504, plaintiffs must show that: (1) Alex is disabled; (2) he is

13 otherwise qualified to participate in the District's program; (3)

14 he has been subject to discrimination by defendants solely

15 because of his disability; and (4) defendants are recipients of

16 federal funding. Wong v. Regents of Univ. of Cal., 192 F.3d 807,

17 816 (9th Cir. 1999). Additionally, plaintiffs bringing § 504

18 claims in the special education context must show that the

19 educational decisions relating to the student were so

20 inappropriate as to constitute either bad faith or gross

21 misjudgment. See, e.g., N.L. v. Knox County Schs., 315 F.3d 688,

22 695-96 (6th Cir. 2003); Sellers v. Sch. Bd., 141 F.3d 524, 529

23 (4th Cir. 1998); Monahan v. Nebraska, 687 F.2d 1164, 1170-71 (8th

24 Cir. 1982); Reid v. Petaluma Joint Union High Sch. Dist., 2000

25 WL 1229059, at *3 (N.D. Cal. 2000). In support of this

26 requirement, courts have explained that:

> [t]he language of the statute is instructive.  It
> prohibits exclusion, denial of benefits, and
> discrimination 'solely by reason of . . . handicap.'
> Manifestly, in order to show a violation of the
> Rehabilitation Act, something more than a mere failure
> to provide the 'free appropriate education' . . . must
> be shown. . . .  We do not read § 504 as creating a
> general tort liability for educational malpractice,
> especially since the Supreme Court . . . has warned
> against a court's substitution of its own judgment for
> educational decisions made by state officials.  We
> think, rather, that either bad faith or gross
> misjudgment should be shown before a § 504 violation
> can be made out, at least in the context of education
> of handicapped children.

Monahan, 687 F.2d at 1170-71.  Thus, the establishment of an IDEA

violation is a necessary, but not sufficient, component of

plaintiffs' § 504 claim.

Finally, a plaintiff seeking monetary damages under § 504

must prove that defendants acted with deliberate indifference.

Duvall v. County of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001).

Deliberate indifference is similar to the bad faith or gross

misjudgment standard, requiring "knowledge that a harm to a

federally protected right is substantially likely, and a failure

to act upon that likelihood."  Id. at 1139.

Defendants contend that, even if plaintiffs make a

sufficient showing of an IDEA violation, they fail to show that

defendants acted with bad faith, gross misjudgment, or deliberate

indifference.  (Mot. at 19-30.)  In response, plaintiffs assert

that the totality of events reveals a pattern of defendants

repeatedly punishing Alex for behaviors that are part of his

disability and sabotaging his education program to justify

removing him from the regular classroom setting.  (Opp'n at 7.)

This pattern began, they assert, when Alex's parents withdrew their consent to physical restraints, and it escalated until defendants succeeded in removing Alex from Valley Oak by means of the TRO.  (Id.)

Plaintiffs' characterization of the evidence is not reasonable and could not be accepted by a reasonable factfinder. The actions/omissions plaintiffs identify, whether taken as a whole or looked at individually, do not suggest bad faith, gross misjudgment, or deliberate indifference on the part of the District.  First, plaintiffs allege that defendants wrongfully used physical restraints on Alex on two occasions in October 2002, despite the explicit withdrawal of consent to such restraints by Alex's parents in June 2002.  (Id.)  These actions demonstrate bad faith or gross misjudgment, they contend, because the withdrawal of consent was explicit, and there could have been no confusion on this issue.[5]  (Id.)

As an initial matter, it is unclear that the Districts' actions violated any law, given that state law explicitly allows school officials to physically restrain students when the student poses an immediate danger to himself or others.  Cal. Code. Regs. tit.5, § 3052(I).  Here, Alex was restrained because he was

---

[5] Plaintiffs also make a conclusory allegation that the District had an inappropriate BIP in place in October 2002. (Opp'n at 7.)  However, plaintiffs present no evidence in support of this allegation.  Moreover, the January 2003 settlement agreement bars plaintiffs from challenging the appropriateness of the BIP.  The requirements for a BIP are discussed and set forth under the IDEA and corresponding state law, and plaintiffs waived all claims under the IDEA as part of the settlement agreement.

jumping across wet tabletops.  The teachers could reasonably have determined that Alex posed an immediate physical danger to himself.  Moreover, Inchausti and Arosteguy used physical restraints approved by the District as part of the District's emergency intervention plan.[6]

Furthermore, even if the use of physical restraints did violate the IDEA, there is no evidence that defendants acted with bad faith, gross misjudgment, or deliberate indifference in doing so.  Rather, the evidence suggests that the teachers believed they were acting within their discretion to protect Alex from imminent harm to himself.  In fact, Inchausti and Arosteguy have both stated that they believed that Alex's prior BIP, which allowed physical restraints, was still in effect in October 2002. (Defs.' SUF ¶ 15.)  Alex has presented no evidence calling into question their good-faith belief.  Accordingly, plaintiffs' argument regarding the physical restraints is unpersuasive.

Second, plaintiffs argue that Dwyer's behavior towards Alex upon his return to her classroom in February 2003 is further evidence of this alleged pattern of discriminatory acts.  (Opp'n at 7-8.)  Specifically, plaintiffs suggest there was some ulterior, discriminatory motive behind Dwyer's decision to begin keeping a daily log of events related to Alex.  (Id.) Additionally, plaintiffs take issue with the District's failure to inform Alex's parents of Dwyer's negative feelings toward him.

---

[6] Plaintiffs make a conclusory allegation that the restraints were improperly applied, but they provide no evidence to support this assertion.

(Id. at 8.)  Plaintiffs argue that a full-inclusion, regular
education program only works where the teacher is open to having
the student in the class, such that the District's failure to
inform plaintiffs of Dwyer's feelings toward Alex ensured the
failure of the program.  (Id.)

This argument is equally unconvincing.  Even if these
actions violate the IDEA, there is no evidence that they were
done with bad faith or rise to the level of gross misjudgment or
deliberate indifference.  The evidence shows that Dwyer began
keeping a daily log about Alex because she was worried and scared
about having him in her classroom.  This does not suggest bad
faith or gross misjudgment, but rather a legitimate fear for her
safety.  Likewise, the District's failure to inform plaintiffs
about Dwyer's concerns about Alex constitutes, at most,
professional misjudgment.  There is no showing of inappropriate
or hostile behavior by Dwyer toward Alex.  Nor should a school
district be required to inform parents every time a teacher has
legitimate concerns about a disruptive child.  Plaintiffs'
suggestion that the District deliberately placed Alex with a
teacher who was scared of him in order to sabotage Alex's
education is not supported by any evidence.

Third, plaintiffs argue that defendants discriminated
against Alex, and intentionally attempted to force him out of
Valley Oak, by refusing to implement the Bridges' behavioral
program.  (Id. at 8.)  Defendants allegedly failed to implement
the program in two key ways: (1) by Dwyer's refusal to implement

Bridges' whole-class reinforcement system; and (2) by school
officials' repeated failure to follow Bridges' advice to ignore
Alex's maladaptive behaviors, specifically with regard to the
fire-alarm incidents.  (<u>Id.</u>)  The Hearing Office analyzed and
rejected both of these arguments.  (Wedner Decl. Ex. A. at 8-11.)

These actions, like the others, are insufficient to
establish bad faith or gross misjudgment on the part of
defendants.  To the contrary, the evidence shows the District
making a good faith effort to implement the Bridges' program.
For instance, the District had several teachers, including Dwyer,
attend a special training session on Bridges' behavior
philosophy.  Likewise, following the March 19th IEP meeting in
which Bridges first suggested the creation of a whole-class
reinforcement system, Dwyer took immediate steps to create such a
program in her classroom.  Although plaintiffs contend that
Dwyer's program was not a whole-class reinforcement program as
described by Bridges, the differences between the Bridges'
proposal and her plan were not great. In any event, plaintiffs
concede that Dwyer was never told that she was required to
implement the exact program suggested by Bridges.  (Defs.' SUF ¶
46.)

Similarly, while some school officials may have reprimanded
Alex for pulling the fire alarms, there is no evidence that these
actions were done in bad faith or constitute gross misjudgment.
In fact, plaintiffs' own evidence shows that the District made
efforts to prevent the school staff from continuing to reprimand

13

1  Alex for such behavior.  Specifically, the District's former

2  special education coordinator went to Valley Oak on at least one

3  occasion to remind the teachers not to reprimand Alex.  (Varma

4  Decl. Ex. 4.)  In short, rather than suggesting bad faith or

5  gross misjudgment, defendants' implementation of Bridges' program

6  reflects a good faith effort to carry out the program while still

7  protecting other students and staff.

8       Finally, plaintiffs contend that defendants' discriminatory

9  plan culminated with the District's decision to unilaterally

10 change Alex's educational placement through a TRO, without first

11 exploring less aggressive options or contacting his parents.

12 (Opp'n at 9.)  Plaintiffs assert that defendants' bad faith and

13 discriminatory intent in taking such actions is evidenced by

14 three facts: (1) the filing of the TRO request without first

15 responding to the letter Alex's parents sent one week prior to

16 the filing; (2) the use of negative and hyperbolic language to

17 describe Alex in the various declarations submitted by school

18 officials in support of the TRO;[7] and (3) the judge's later

19 decision at the preliminary injunction hearing to vacate the

20 portions of the TRO regarding the educational placement of Alex.

21 (Id. at 9-10.)

22      This argument fails for many of the same reasons described

23

24      [7]  Alex complains about the use of descriptive terms in the
25 declarations, such as "unpredictably violent," "methodical [in
   planning violence]," "intimidating," "threatening," "ticking time
26 bomb," "menacing," "physically abusive," "psychotic," "going
   ballistic," "toughest year of teaching in thirteen years" to
   describe him and the circumstances.  (Opp'n at 10.)

above.  For one, the District's decision to change Alex's

educational placement through a TRO request does not necessarily

violate the IDEA.  The Supreme Court held in <u>Honig v. Doe</u>, 484

U.S. 305, 324-28, 108 S.Ct. 592 (1988) that although school

officials do not have unilateral authority to exclude a disabled

student based on violent and dangerous behavior, they can, in

certain circumstances, seek judicial relief to change the

educational placement of a dangerous child.  Courts since <u>Honig</u>

have repeatedly held that they can order the removal of dangerous

children where the district shows that maintaining the child in

the current placement is substantially likely to result in injury

to himself or others and that the District has done all that it

reasonably can to reduce the risk that the child will cause that

injury.  <u>See, e.g.</u>, <u>Light v. Parkway C-2 Sch. Dist.</u>, 41 F.3d

1223, 1228 (8th Cir. 1995) (articulating this standard); <u>Office

of Special Education Programs Memorandum</u>, 97-7, 26 IDELR 981, at

*4 (Aug. 9, 1997) (affirming that IDEA continues to allow

districts to seek removal of children through court process in

appropriate circumstances); <u>Henry v. Sch. Dist. Admin. Unit No.

29</u>, 70 F.Supp.2d 52, 58 (D.N.H. 1999) (same).

Even if the District did violate the IDEA by seeking a TRO

without first exhausting the IDEA's administrative procedures,

there is no evidence that the District's actions constitute bad

faith or gross misjudgment.  Rather, the evidence suggests that

the District was acting reasonably and in good faith to resolve a

difficult situation posed by a disruptive and violent student.

1  Given the case law described above, its decision to pursue a TRO,

2  on the advice of legal counsel, cannot be the basis for a finding

3  of discrimination.  Although the District did not first contact

4  Alex's parents, their failure to do so neither violates the IDEA

5  nor establishes bad faith or gross misjudgment.  Finally, the

6  Yolo County Superior Court's ruling does not change this

7  conclusion, as the court simply referred the issue of Alex's

8  placement to the District's Hearing Office.  The court in no way

9  suggested that it was bad faith or gross misjudgment for the

10 District to have sought a TRO.

11      Likewise, the descriptions of Alex included in the various

12 declarations do not provide evidence of bad faith or gross

13 misjudgment.  Although plaintiffs may disagree with the school

14 officials' description of Alex, they have presented no evidence

15 establishing that the statements were false or that school

16 officials did not honestly believe these statements to be true.

17 For the above reasons, plaintiffs' arguments regarding the TRO

18 lack merit.

19      In sum, whether taken individually or as a whole,

20 plaintiffs' allegations do not establish that defendants' actions

21 amount to bad faith, gross misjudgment, or deliberate

22 indifference.  No reasonable factfinder could so find.

23 Accordingly, the court GRANTS defendants' motion for summary

24 judgment on this claim.

25 B.  § 504 Retaliation Claim

26      For similar reasons, plaintiffs fail to establish a § 504

1  retaliation claim.  Because plaintiffs present no direct evidence

2  of retaliation on the part of defendants, the court analyzes

3  their claim under the McDonnell-Douglas burden-shifting test used

4  to evaluate Title VII retaliation claims.[8]  See Peebles v. Potter,

5  354 F.3d 761, 770 (8th Cir. 2004) (holding that the

6  McDonnell-Douglas burden-shifting test is used to analyze § 504

7  retaliation claims where no direct evidence of retaliation

8  exists).  To establish a prima facie claim of retaliation under §

9  504, plaintiffs must show that: (1) they engaged in a protected

10  activity; (2) the defendants knew they were involved in the

11  protected activity; (3) an adverse action was taken against them;

12  and (4) a causal connection exists between the protected activity

13  and the adverse action.  See, e.g., Weixel v. Bd. of Educ., 287

14  F.3d 138, 148 (2d Cir. 2002); Hunt v. St. Peter Sch., 963 F.Supp.

15  843, 854 (W.D.Mo. 1996).

16      If the plaintiffs establish a prima facie case, the burden

17  shifts to defendants to show a legitimate, non-retaliatory

18  purpose for their acts.  Hunt, 963 F.Supp. at 854; Johnson v.

19  Sullivan, 945 F.2d 976, 980-81 (7th Cir. 1991).  Upon this

20  showing, the burden shifts back to the plaintiffs to demonstrate

21  that the proffered reason was pretextual.  Johnson, 945 F.2d at

22  980-81.  To overcome defendants' legitimate, non-discriminatory

23

24      [8]  Plaintiffs do allege that Clumpner, the District's former
   special education coordinator, commented at an IEP meeting in
25  December 2002 that filing for due process is "a very difficult
   process," and that if plaintiffs chose to file for due process,
26  "relationship [between the parties] would never be the same."
   (Wedner Decl. Ex. W at 247.)  This sole, ambiguous statement is
   insufficient to constitute direct evidence of retaliation.

1  reason, plaintiffs must "show that the articulated reason is

2  pretextual 'either directly by persuading the court that a

3  discriminatory reason more likely motivated the [school district]

4  or indirectly by showing that the [school district's] proffered

5  explanation is unworthy of credence.'"  <u>Villiarimo v. Aloha

6  Island Air, Inc.</u>, 281 F.3d 1054, 1062 (9th Cir. 2002).  If the

7  plaintiffs are relying solely on indirect or circumstantial

8  evidence of pretext, then the evidence must be "specific" and

9  "substantial" to survive summary judgment.  <u>Id.</u>  (citing <u>Godwin

10  v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1221 (9th Cir. 1998)).

11     Here, plaintiffs have arguably established a prima facie

12  case of retaliation.  (Opp'n at 11.)  First, plaintiffs have

13  identified several protected activities engaged in by Alex's

14  parents, namely: (1) withdrawing their consent to the use of

15  physical restraints in June 2002; (2) filing a request for a due

16  process hearing in December 2002; (3) refusing to agree to the

17  District's IEP proposal in March 2003; and (4) writing a letter

18  to the District on April 11, 2003 complaining about the

19  implementation of the settlement agreement.  (<u>Id.</u>)  Second,

20  plaintiffs assert that the District and its staff were aware of

21  all the above protected activities.  (<u>Id.</u>)

22     Third, plaintiffs identify several allegedly retaliatory,

23  adverse actions taken by defendants, many of which the court has

24  already discussed, including: (1) failing to develop an

25  appropriate behavior plan; (2) using physical restraints when the

26  inappropriate behavior plan failed; (3) not revealing that Dwyer

1  was suffering emotional distress and was afraid of Alex; (4)

2  refusing to abide by the behavior recommendations of Bridges; (5)

3  sabotaging Bridges' behavior techniques regarding the fire alarm;

4  (6) requesting a TRO to unilaterally change Alex's educational

5  placement; and (7) embellishing descriptions of him as a

6  dangerous individual to support its TRO request.  (Id. at 11-12.)

7  Even though many of these allegations are weak, as described

8  above, they are sufficient to meet plaintiffs' low prima facie

9  burden.[9]

10      Finally, Alex has established a sufficient causal connection

11  to satisfy the prima facie test.  Courts have generally held that

12  causation can be inferred from timing alone where the adverse

13  action follows closely on the heels of the protected activity.

14  See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268,

15  273-74, 121 S.Ct. 1508 (2001) (stating that the temporal

16  proximity must be "very close").  Here, Alex's parents engaged in

17  several protected activities between June 2002 and April 2003.

18  Although some of the alleged adverse actions did not occur

19  immediately after these actions, several others did.  For

20  instance, the District's request for a TRO occurred a month or

21  less after Alex's parents rejected the District's IEP proposal in

22  March 2003.  Courts have found a one-month period sufficiently

23

24  _____

25      [9] Defendants argue that some of the identified actions are
   not "adverse" because they do not constitute a violation of the

26  IDEA.  (Mot. at 26.)  However, this still remains an open
   question because defendants have not moved for summary judgment
   on Alex's IDEA claim.

close to create an inference of a causal connection.[10]

Calero-Cerezo v. DOJ, 355 F.3d 6, 25-26 (1st Cir. 2004).

Furthermore, when looked at as a whole, plaintiffs are alleging a

pattern of escalating retaliatory actions in response to various

protected activities taken by Alex's parents.  The interrelated

nature of the protected activities and the alleged adverse

actions is probably sufficient to establish the causal connection

element of the prima facie case.

Even if plaintiffs have established a prima facie case,

however, they fail to present any evidence rebutting or

overcoming defendants' legitimate, nondiscriminatory reason.

Defendants contend that their actions, rather than being

retaliatory, were motivated by a desire to protect Alex, the

other students, and the staff from Alex's dangerous behavior, and

to provide Alex with a FAPE.  (Mot. at 26.)  Far from rebutting

this proffered reason, the parties' evidence supports defendants'

position.  As described more fully above, the evidence shows

defendants struggling to handle an undisputedly difficult child

and making good faith efforts to meet Alex's needs while also

protecting Alex, the other students, and the school staff from

Alex's disruptive behavior.  In short, plaintiffs' evidence falls

[10]   Defendants argue that there is no causal connection
between their TRO application and the April 11, 2003 letter
because they started the process of seeking a TRO before April
11.  (Mot. at 25.)  However, the refusal of Alex's parents to
agree to an IEP plan in mid-March 2003 was also a protected
activity and, as noted above, the District began to consider a
TRO application less than a month thereafter.  Therefore, a
causal connection can be inferred from the timing of the
District's actions.

1   far short of the "specific" and "substantial" evidence of pretext

2   necessary to overcome defendants' legitimate, nondiscriminatory

3   reason.  Accordingly, the court GRANTS defendants' motion for

4   summary judgment on this claim.

5                                III.

6       For the forgoing reasons, the court GRANTS defendants'

7   motion to dismiss plaintiffs' retaliation and discrimination

8   claims brought under § 504 of the Rehabilitation Act as against

9   all defendants.

10      IT IS SO ORDERED.

11  Dated: 8/19/2005

12

13

14

15                              _____

16                              DAVID F. LEVI
                                United States District Judge

17

18

19

20

21

22

23

24

25

26